## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

| | | |
|---|---|---|
| **Gilberto Rodriguez CHAVERRA**, as the Administrator of the Estate of Jeancarlo Alfonso Jimenez Joseph, and<br><br>**Nerina Joseph**, as Mother and Next-of-Kin of Jeancarlo Alfonso Jimenez Joseph,<br><br>*Plaintiffs*,<br><br>v.<br><br>**Sean Gallagher**, in his Individual Capacity as Field Office Director, U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations Atlanta Field Office,<br><br>**John Bretz**, in his Individual Capacity as Assistant Field Office Director, Stewart Detention Center, U.S. Immigration and Customs Enforcement,<br><br><br>**John Does 1-10**, in their Individual Capacities as U.S. Immigration and Customs Enforcement officials.<br><br>*Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Complaint**<br><br><br>Civil Action No.: 4:19-cv-81<br><br><br>**Jury Demand** |

### INTRODUCTION

1.   This action arises out of the torture and preventable death of a longtime U.S. resident inside a solitary confinement cell at one of America's largest and deadliest civil immigration prisons.

2.   Jeancarlo Alfonso Jimenez Joseph ("Jean")[1], a 27-year-old recipient of Deferred Action for Childhood Arrivals ("DACA") who lived in the United States for over half his life after entering lawfully as child, died inside a solitary confinement cell while in U.S. Immigration and Customs

---

[1] Pronounced "Gene".

1

Enforcement ("ICE") custody at the Stewart Detention Center ("SDC") in Lumpkin, Georgia on May 15, 2017.

3.  The Georgia Bureau of Investigation ("GBI") concluded Jean died of asphyxiation by using a sheet from inside his solitary confinement cell to fashion a noose, affix it to a sprinkler head, and hang himself.

4.  Jean did not have to die. Days after he arrived at SDC, Defendants learned of Jean's diagnoses of acute psychosis and schizoaffective disorder–bipolar type, his recent suicide attempts, and his involuntary commitments for acute risk of suicide.

5.  Despite this knowledge, and the clear risk of Jean's deterioration, self-harm, or suicide if they failed to act, Defendants refused to follow ICE's binding policies and directives requiring them to render Jean the care he repeatedly begged for.

6.  But Defendants did not simply neglect Jean's condition until his death by failing to ensure he was properly monitored, appropriately medicated, and afforded consideration for placement at alternate facilities, as ICE's standards required them to do. Rather, they took repeated, affirmative steps to punish Jean with prolonged solitary confinement for attempting to harm himself and acting on the command auditory hallucinations he told them about.

7.  Defendants' affirmative, personal decisions to punish Jean for suffering from suicidal ideation and acting on the unrelenting command auditory hallucinations that tortured him once inside solitary caused Jean severe physical and mental pain and suffering.

8.  The direct, personal acts and omissions of Defendants Sean Gallagher, John Bretz, and other ICE officials constitute torture, cruel, inhuman, and degrading treatment that caused Jean's death.

9.  Accordingly, Jean's mother, Nerina Joseph, and his step-father and Estate Administrator, Gilberto Chaverra, bring this action for compensatory and punitive damages against Defendants for

their deliberate indifference to Jean's serious medical needs, and the torture and cruel, inhuman, and degrading treatment to which they subjected him.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over Plaintiffs' Constitutional deliberate indifference claim under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a).

11. Subject-matter jurisdiction lies over Plaintiffs' Alien Tort Statute ("ATS") claim pursuant to 28 U.S.C. § 1350.

12. Venue is proper within this District and division pursuant to 28 U.S.C. §§ 1391(b)(1), (b)(2), and (e)(1).

## PARTIES

13. Plaintiff **Gilberto Rodriguez Chaverra** is an adult resident of the State of North Carolina. On December 19, 2017, the Wake County Superior Court issued Letters of Administration appointing Plaintiff the Administrator of the Estate of Jeancarlo Alfonso Jimenez Joseph pursuant to N.C.G.S. §§ 28A-6-1; 28-A-6-3; 28A-11-1; 36C-2-209. Case No. 2017 E 004100. Plaintiff Chaverra sues in his capacity as Administrator of Jean's Estate for Jean's pre-death suffering and injuries and all damages arising therefrom.

14. Plaintiff **Nerina Joseph** is an adult resident of the State of North Carolina. She is the natural mother and next-of-kin of Mr. Jimenez. Plaintiff Joseph sues as the legal holder of wrongful death claims for damages arising from Defendants' unlawful acts and omissions that caused Jean's death.

15. Defendant **Sean Gallagher** was the Field Office Director of the ICE Enforcement and Removal Operations Atlanta Field Office at all times relevant to this Complaint.

16. In that capacity, Defendant Gallagher was chiefly responsible for ICE's operations at SDC.[2]

17. Pursuant to multiple, binding, non-discretionary ICE policies, Defendant Gallagher was the individual tasked with personally receiving notifications regarding detained immigrants with serious medical and mental health conditions at SDC and then personally ensuring decisions regarding their continued detention, classification, and medical care complied with constitutional, statutory, regulatory, and policy requirements.[3]

18. Defendant Gallagher was personally responsible for reviewing the placement in segregation of individuals with serious mental health issues, such as Jean, and monitoring their mental health while in solitary.

19. Defendant Gallagher was personally responsible for ensuring SDC was adequately staffed, that staff were adequately trained, and that the individuals incarcerated within SDC's walls received proper medical and mental healthcare.

20. In his capacity as Field Office Director, Defendant Gallagher was also personally responsible for notifying various ICE offices in Washington, D.C. of specified critical events involved detained individuals at SDC within specific timeframes, and with ensuring ICE's medical and custody

---

[2] *See, e.g.*, Department of Homeland Security, Office of Inspector General, ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards, Report No. OIG-19-18 (Jan. 29, 2019) ("The Field Office Directors are chiefly responsible for the detention facilities in their assigned geographic area.") *available at* https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

[3] *See* ICE Policy 11071.1, Assessment and Accommodation of Detainees with Disabilities (Dec. 15, 2016) *available at* https://creeclaw.org/wp-content/uploads/2019/03/Disability-Directive.pdf; ICE Policy 11065.1, Review of the Use of Segregation for ICE Detainees (Sept. 4, 2013) *available at* https://www.ice.gov/doclib/detention-reform/pdf/segregation_directive.pdf; ICE Policy 11063.1, Civil Immigration Detention: Guidance for New Identification and Information-Sharing Procedures Related to Unrepresented Detainees with Serious Mental Disorders or Conditions (Apr. 22, 2013) *available at* https://www.ice.gov/doclib/detention-reform/pdf/11063.1_current_id_and_infosharing_detainess_mental_disorders.pdf; and ICE 2011 Performance-Based National Detention Standards (rev. 2016) ("PBNDS") *available at* https://www.ice.gov/detention-standards/2011.

management officials had timely, accurate information regarding the care and treatment of certain classes of detained immigrants at SDC, including, but not limited to, individuals in segregation with serious mental health issues, individuals in general population identified as being at risk of suicide, and individuals with mental health diagnoses that could affect their competency to participate in removal proceedings.

21. Defendant Gallagher is sued in his individual capacity.

22. Defendant **John Bretz** was an Assistant Field Office Director ("AFOD") of the ICE Enforcement and Removal Operations Atlanta Field Office at all times relevant to this Complaint.

23. Defendant Bretz was the AFOD stationed at and directly responsible for all of ICE's day-to-day operations at SDC.[4]

24. Defendant Bretz was personally responsible for monitoring individuals at SDC with serious medical illnesses or mental health diagnoses, approving disciplinary actions such as placement in segregation, assessing and reporting to Defendant Gallagher on the continuing advisability of detained individuals' placement in solitary confinement on an ongoing basis, ensuring all detained immigrants receive timely, adequate, and effective medical and mental healthcare, and engaging and reporting to Defendant Gallagher or his designees in all tasks requiring Defendant Gallagher's personal approval by law and ICE policy.

25. Defendant Bretz is sued in his individual capacity.

26. Defendant **John Does ICE officials 1-10** were, at all times relevant to this Complaint, employees of U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations within the Atlanta Field Office. Though their true identities are known to them, ICE has refused to

---

[4] *See, e.g.*, New Release: "ERO Lumpkin core location of ICE operations" ICE Newsroom (Jun. 20, 2017) *available at* https://www.ice.gov/news/releases/ero-lumpkin-core-location-ice-operations.

disclose these individuals' true and correct names despite over a year of ongoing litigation seeking that information. *See Chaverra v. U.S. Immigration and Customs Enforcement*, No. 1:18-cv-00289-JEB, ECF No. 3-1 (D.D.C. filed Feb. 9, 2018).

27. As part of their duties, these individuals personally interacted with Mr. Jimenez and the medical and contract detention staff on multiple occasions beginning when Mr. Jimenez was identified by ICE in Wake County, North Carolina and continuing to his detention, solitary confinement, and death at SDC.

28. On information and belief, one or more of these individuals held the title of "Deportation Officer" and was assigned Jean's case during the time he was detained at Stewart.

29. On information and belief, one or more of these individuals held the title of "Supervisory Detention and Deportation Officer" and was directly responsible for monitoring Jean's individual case as it proceeded once he arrived at SDC.

30. On information and belief one or more of these individuals held the title "Deputy Field Office Director" or "Acting Field Office Director" and served as a personal designee of Defendants Gallagher and/or Bretz on at least one occasion.

31. Defendant Does are believed to have performed their duties both within SDC and also at the ICE ERO Atlanta Field Office in Atlanta, Georgia. Defendant Does 1-10 are sued in their individual capacities.

32. Plaintiffs intend to seek leave of Court to conduct brief, expedited discovery to determine the identities of John Does 1-10, and if granted such permission, will amend their Complaint accordingly.

## FACTS

A. **Jean's Last Six Months Before ICE Detention:**
   **Recent Head Injury, Diagnoses for Acute Psychosis and Schizophrenia, Psychiatric Treatment, Suicidal Ideation, Involuntary Commitment, Thwarted Suicide Attempt in Custody, Second Involuntary Commitment, and Protective Custody Prior to his Fifth ICE Encounter in the Wake County, North Carolina Detention Center.**

33. On February 5, 2017, Designated Immigration Officer Ramos, a Wake County Sheriff's Office ("WCSO") employee performing certain functions of a federal immigration officer under 8 U.S.C. § 1357(g), encountered Jean at the Wake County, North Carolina Detention Center.

34. This was the fifth time ICE had encountered Jean in WCSO custody since August 24, 2016.

35. Jean's mental health took a rapid decline on or about June 2, 2016 following a head injury in which he lost consciousness and sought treatment at an emergency room.

36. Jean later reported that the auditory and visual hallucinations, his thoughts of suicide, and his inability to control his actions in the face of command hallucinations all became markedly worse after hitting his head and experiencing what he believed was a seizure.

37. He sought and received outpatient mental health treatment for acute psychosis on July 17, 2016. During this visit, Jean he was diagnosed with psychosis after "seeing things not congruent with reality." Jean reported that the Seroquel he was prescribed slowed down his thoughts and made him feel more normal, but also that he was currently without a home and did not refill the prescription when it ran out. Clinicians noted Jean reported having a "special understanding of the world, feeling 'the air between animals' and being an artist." His mother indicated that Jean desperately needed treatment, and that his condition was getting worse.

38. A clinical mental health assessment performed that day noted Jean had a "history of psychosis and remote suicidal ideation," and presented "for evaluation of danger to self and others and mental stability." The clinician noted Jean was "at risk for further worsening of a psychiatric condition" and, based on "safety concerns" "recommend[ed] that, following any necessary medical clearance, [Jean] be admitted to an inpatient psychiatric unit for safety, stabilization, and treatment." Ultimately, a psychiatrist concluded Jean did not present an imminent risk of harm to himself or others and declined to involuntarily commit him, electing instead to set a follow-up appointment for July 22.

39. Jean was first admitted to WCSO custody on August 24, 2016, after his mother called the police seeking assistance with bringing him back to a psychiatric treatment facility for acute care. Instead, he was arrested for damage he caused to property outside her home.

40. On September 4, a WCSO correctional officer observed Jean displaying erratic behavior in his dorm and placed him on suicide watch. Once on suicide watch, Jean told a mental health professional he'd attempted suicide three years earlier after a breakup with his girlfriend. After refusing to get into his bunk two days later, Jean was placed in protective custody on September 6, 2016. WCSO released Jean from custody on September 7, 2016.

41. Jean returned to WCSO custody on October 14, 2016. He reported hearing voices to the nurse during booking and endorsed past suicide attempts and a diagnosis of acute psychosis.

42. On October 18, 2016, Jean was involuntarily committed by the Wake County Sheriff's Office for his own safety after endorsing command auditory hallucinations and an active plan to take his own life by drowning himself in the toilet of his cell. During his inpatient mental health treatment from October 18-25, 2016, Jean endorsed two prior suicide attempts, including one by hanging.

43. Jean returned to WCSO custody from November 9-26, 2016. During this period, he was noted as having a diagnosis of schizophrenia, given a psych referral, and medicated with Risperdal. On November 21, 2016, Jean a WCSO officer observed Jean walking naked from the shower into the day room. He was then referred to mid-level mental health intervention.

44. Jean returned to WCSO custody again on December 8, 2016. During his initial medical screening, he explained that he believed someone could control his mind by reading his thoughts, that he currently believed someone was putting thoughts into his head, that he could hear voices and see things that aren't there, that he had previously attempted suicide, and that he was previously hospitalized in a mental health facility.

45. On December 13, 2016, Jean was placed in protective custody—a cell by himself—"due to having some mental health issues that were keeping him from adjusting to G[eneral] P[opulation]."

46. Two days later, just before midnight on December 15, 2016, a WCSO officer found Jean inside his cell attempting to hang himself with a noose he had fashioned from a bedsheet. Jean later told mental health professionals the voices in his head were louder, and that he "wanted to leave here . . . to leave it all for good." Jean was eventually stepped down from suicide watch, but remained in protective custody until his release on January 5, 2017.

47. A week later, on January 12, 2017, Jean and his mother went back to seek inpatient mental health treatment for his acute, ongoing psychosis and schizophrenia. Jean explained to a provider who saw him that day that he believed he had committed suicide in jail and been resurrected with special powers. Plaintiff Joseph related that Jean had motioned towards his chest with a knife days earlier and said, 'send me to the glory."

48. The triage clinician noted that Jean "was in the lobby yelling he was going to kill himself" prior to triage. Jean was involuntarily committed and remained in the hospital receiving care until January 25, 2017.

49. Jean's last living day of freedom would be February 5, 2017. Upon his return to WCSO custody, he was immediately placed into protective custody, with notes that he had a history of displaying 10-96 (mental-health related) behavior and acting erratic in the dorm and having trouble getting along with others in the general population.

50. It was this history that stared back at Designated Immigration Officer Ramos when he reviewed Jean's WCSO Booking Records and Incident Reports on the screen of a computer during the ICE encounter on February 5, 2017. It was this history that caused Officer Ramos to note on ICE forms that Jean "previously displayed erratic and strange behavior" while incarcerated in Wake County.

51. Nevertheless, Officer Ramos noted that Defendant Gallagher approved of Jean's arrest and detention as a "federal interest." Consequently, Jean entered ICE custody in the Wake County Detention Center on or around March 2,2017. He was transferred to York County, South Carolina on or around March 4, 2017, and then to SDC on or around March 7, 2017.

52. Defendant Gallagher, Defendant Bretz, and Defendant John Doe ICE Agent failed to ensure Jean's prior detention records, medical records, and indeed, his vitally necessary prescription medication for schizophrenia and psychosis accompanied him in transport, in violation of ICE's policies.

**B.  Jean's Detention and the "ticking bomb" Defendants Gallagher and Bretz Created at SDC.**

53. Just hours after his arrival at SDC on March 7, 2017, ICE officials placed Jean on suicide watch because he endorsed auditory hallucinations, active suicidal ideation, a history of suicide attempts, and prior inpatient treatments for schizophrenia and psychosis during this ICE medical screening. Defendants Gallagher and Bretz were personally made aware of Jean's placement on suicide watch and the reasons for it—namely, his serious, diagnosed mental health condition and suicidal ideation— no later than March 9, 2017.

54. Defendant Gallagher and Defendant Bretz's notification of Jean's presence in SDC and his serious mental illness triggered a host of binding, non-discretionary legal obligations under ICE's directives governing detention and are of persons with disabilities, ICE policies governing prosecution of such persons in civil immigration proceedings, and ICE directives regarding consideration of whether SDC was an appropriate custodial setting for his particular serious medical needs. Yet Defendants Gallagher and Bretz failed to take nearly all of the actions those binding policies mandated.

55. Defendants Gallagher, Bretz, and ICE Does 1-10 were personally aware of the mandatory ICE training regarding suicide and significant self-harm prevention for individuals detained in SDC.[5]

56. Defendants Gallagher and Bretz knew or should have known that the current physical plant and staffing levels at SDC put Jean's health and safety at an unacceptable risk.

57. Specifically, Defendants Gallagher and Bretz were aware of the life-threatening implications of SDC's chronic shortages in staffing of ICE officers, medical staff, and correctional officials.

58. Both before and after Jean's death, the Department of Homeland Security's Office of Inspector General ("DHS-OIG") released reports documenting ICE officials' failures to provide adequate mental healthcare, including at SDC,[6] and violations of ICE policies harming vulnerable populations at SDC—particularly those in solitary confinement and those suffering from mental health and other medical issues.[7]

59. ICE itself noted in federal contracting documents issued before Jean's death the difficulty of ensuring adequate medical staffing at SDC, and the potentially lethal consequences of such systemic, chronic understaffing.[8]

---

[5] *See, e.g.*, ICE 2011 PBNDS § 4.6 Significant Self-Harm and Suicide Prevention and Intervention (rev. 2016) *available at* https://www.ice.gov/doclib/detention-standards/2011/4-6.pdf; ICE 2011 PBNDS § 4.3 Medical Care *available at* https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf.

[6] *See ICE Struggles to Hire and Retain Staff for Mental Health Cases in Immigration Detention*, Department of Homeland Security, Office of Inspector General, OIG-16-113-VR (Jul. 21, 2016) *available at* https://www.oig.dhs.gov/assets/VR/FY16/OIG-16-113-VR-Jul16.pdf.

[7] *Concerns about ICE Detainee Treatment and Care at Detention Facilities*, Dept. of Homeland Security, Office of Inspector General, OIG-18-32 (Dec. 11, 2017) (citing SDC for PBNDS violations relating to detainee classification, grievances, segregation, and medical care) *available at* https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf; *ICE Field Offices Need to Improve Compliance with Oversight Requirements for Segregation of Detainees with Mental Health Conditions*, Dept. of Homeland Security, Office of Inspector General, OIG-17-119 (Sept. 29, 2017) *available at* https://www.oig.dhs.gov/sites/default/files/assets/2017-11/OIG-17-119-Sep17.pdf.

[8] *Justification for Other than Full and Open Competition*, U.S. Immigration and Customs Enforcement, Office of Acquisition Management (Jan. 25, 2017) ("Presently, ICE's Stewart Detention Center . . . [is] in critical need of RN staff to sustain operations[.] . . . At the Stewart Detention Center, which houses an average population of 1,850 detainees, only 1 in 5 of the Public Health Service positions is currently occupied (20% fill rate). . . . ICE's failure to sustain minimum RN staff levels will require

60. No later than February 2017—a month before Jean arrived at SDC, Defendants Gallagher and Bretz knew SDC's chronic staffing shortages endangered the health and safety of everyone there—detained individuals and staff alike.

61. According to DHS-OIG[9], independent monitoring and reports by civil society groups including Project South[10], and the admissions of ICE itself[11], chronic, dangerous understaffing at Stewart presented a "ticking bomb."[12]

62. DHS-OIG investigators noted "some detaine[d immigrants] at . . . Stewart Detention Center reported long waits for the provision of medical care, including instances of detaine[d immigrants] with painful conditions, such as infected teeth and a knee injury, waiting days for medical interviewing."[13]

---

healthcare services to be reduced at each facility, endangering detainee and non-detainee safety, disrupting detention operations[.]) *available for download at* https://www.fbo.gov/utils/view?id=d44b68b3addf8474657256199d574f76 via https://govtribe.com/project/ihsc-maxim-ja-for-berks-and-stewart.

[9] U.S. Dep't of Homeland Security Office of Inspector General, *Concerns about ICE Detainee Treatment and Care at Detention Facilities*, OIG-18-32 (Dec. 11, 2017) (finding "long waits for the provision of medical care, including instances of detainees with painful conditions," unhygienic conditions, lack of sanitary supplies, and an "inconsistent and insufficiently documented grievance resolution process" at Stewart, as well as "language barriers [that] prevented detainees from understanding medical staff" general).

[10] Imprisoned Justice, *supra note* 2.

[11] Elly Yu, "Staff describe Georgia immigrant detention center as 'ticking bomb'" Reveal (Jun. 5, 2018) ("Federal records obtained . . . show the U.S. Department of Homeland Security's Office of Inspector General found widespread problems at Stewart Detention Center in southwest Georgia, including drug smuggling and staffing shortages that employees said endangered detention officers and detainees."). *Available at* https://www.revealnews.org/blog/staff-describe-georgia-immigrant-detention-center-as-ticking-bomb/.

[12] DHS-OIG FOIA Response 2018-IGFO-00059 at 16. *Available at* https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO-00059_Final-Response_watermark-4.pdf

[13] U.S. Dep't of Homeland Security Office of Inspector General, *Concerns about ICE Detainee Treatment and Care at Detention Facilities*, OIG-18-32 (Dec. 11, 2017) (finding "long waits for the provision of medical care, including instances of detainees with painful conditions," unhygienic conditions, lack of sanitary supplies, and an "inconsistent and insufficiently documented grievance resolution process" at Stewart, as well as "language barriers [that] prevented detainees from understanding medical staff" general).

63. Captain James Blankenship, the ICE Public Health Service Administrator at SDC, told DHS-OIG Investigators on February 8, 2017, that Stewart suffered from "chronic shortages of almost all medical staff positions."[14]

64. According to DHS-OIG's investigators' interview with an ICE supervisor at Stewart on February 8, 2017, "ICE ERO [was] severely understaffed in [the] Stewart facility. In addition, there is a problem with turnover among the officers."[15]

65. A CoreCivic Unit Manager at Stewart concurred with this assessment during his interview with DHS-OIG investigators: "Mr. [redacted] related that his biggest concern at SDC is staffing shortages which post a risk to the staff's safety."[16]

66. An ICE Mission Support Specialist and Contract Officer's Technical Representative concurred during her interview with DHS-OIG, stating "ICE ERO staffing is 'stretched thin' at Stewart and there is 'a revolving door' when it comes to attrition."[17]

67. CoreCivic's staffing levels were so low that detained immigrants at SDC, including Jean, were forced to request medical attention at 4 o'clock in the morning or receive none at all: "Mr. [redacted] reports that the current sick call process will be changed once CoreCivic hires more officers. Currently detainees request sick call appointments at 4am, before breakfast. They are then scheduled for an appointment the same day. In the event of an emergency, CoreCivic employees will contact medical

---

[14] DHS-OIG FOIA Response 2018-IGFO-00059 at 34-36. *Available at* https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO-00059_Final-Response_watermark-4.pdf.
[15] DHS-OIG FOIA Response 2018-IGFO-00059 at 17. *Available at* https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO-00059_Final-Response_watermark-4.pdf
[16] DHS-OIG FOIA Response 2018-IGFO-00059 at 12. *Available at* https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO-00059_Final-Response_watermark-4.pdf
[17] DHS-OIG FOIA Response 2018-IGFO-00059 at 21. *Available at* https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO-00059_Final-Response_watermark-4.pdf

staff and medical staff take the detaine[d] immigrant to the medical area, or if necessary call an ambulance."[18]

68. Medical staff's reliance on CoreCivic to identify individuals like Jean who were in acute medical was problematic, however, given that Capt. Blankenship reported to DHS-OIG "that one of the facility's biggest issues is under-communication. There are often significant time gaps before the medical office is notified of detainees breaking hunger strikes, fall incidents, and others."[19]

69. ICE itself acknowledged the grave dangers of combining chronic medical understaffing at SDC long before Jean.

70. In a Justification for Other Than Full and Open Competition signed by an ICE contracting official on January 25, 2017, ICE noted that at Stewart "which houses an average population of 1,850 detaine[d immigrants], only 1 of 5 Public Health Service positions is currently occupied (20% fill rate). . . . ICE's failure to sustain minimum RN staffing levels will require healthcare services to be reduced . . . endangering detainee and non-detainee safety, disrupting detention operations . . . causing unnecessary evacuation of detaine[d immigrants] in order to bring the healthcare provider ration into compliance[.]" ICE warned **"[f]ailure to fill these services . . . will cause the sites to shut down, significantly curtail operations, or suspend acceptance of detaine[d immigrants] due to inadequate medical staffing."** IHSC Maxim J&A for Berks and Stewart; Solicitation Number HSCDEM-15-C-00004 (Mar. 1, 2017) (emphasis added).

71. DHS-OIG documented ICE's chronic failure to inspect, monitor, and effectively punish contractors like CoreCivic who serially violate the agency's detention standards.[20]

---

[18] DHS-OIG FOIA Response 2018-IGFO-00059 at 35. *Available at* https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO-00059_Final-Response_watermark-4.pdf
[19] *Id.* at 36.
[20] U.S. Dep't of Homeland Security, Office of Inspector General, "ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements" OIG-18-

72. Despite their knowledge of Jean's serious medical need, the grave risk of suffering or death it posed, and the necessity of ensuring that he receive continuous care and treatment that SDC was incapable of providing, Defendants Gallagher and Bretz allowed Jean's detention at SDC to continue uninterrupted.

73. Defendants Gallagher and Bretz personally knew that only one of the four required behavioral health positions in SDC's staffing plan filled.

74. They were aware that SDC had no on-site psychiatrist available to prescribe or alter dosages of vital medications.

75. And they knew that this unlawfully low staffing ratio left only one Licensed Clinical Social Worker responsible for treating nearly 2000 detained individuals 24 hours a day, 7 days a week—a situation ICE officials concluded hours after Jean's death was "not doable."

**C. Jean's Severe Pain and Suffering and Deterioration at SDC as a Result of Defendants' Failures to Act.**

76. Jean spent nearly all of his first month at SDC begging ICE personnel for an increase in the dosage of the medication he needed to control the auditory and visual hallucinations he was experiencing.

77. Yet he continued to received only one-quarter of the dosage of Risperidone (2mg) that had previously proven effective because Defendants Gallagher and Bretz failed to adequately staff SDC with enough medical personnel to ensure the safety of people confined there, or to transfer Jean to an inpatient mental health treatment facility when his condition worsened.

78. Specifically, ICE officials documented, and Defendants Gallagher and Bretz were aware, that Jean specifically requested an increase in his medication because the voices in his head were getting

---

67 (Jun. 26, 2018). *Available* at https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.

worse. ICE officials documented that Jean made these requests on March 14, March 20, April 4, April 11, April 14, April 19, April 25, May 1, May 2, and May 10, 2017.

79. Accompanying these notifications to Defendants Gallagher and Bretz regarding Jean's requests were a series of increasingly dire manifestations of the worsening of his already fragile mental state.

80. Almost immediately after his initial release from mental health observation into the general population, Jean had to be reassigned to a different pod because he walked out of the shower naked and exposed himself to others—precisely the behavior pattern displayed in Wake County in the months leading up to his attempts to hang himself.

81. On March 14, 2017, Jean admitted to ICE personnel he was experiencing auditory hallucinations.

82. On April 4, 2017, Jean called the Detention Reporting and Information Line ("DRIL") to make a complaint that he was suffering from a serious mental illness and not receiving the proper treatment. ICE officials responsible for overseeing the DRIL program notified Defendants Gallagher and Bretz, who responded, falsely, that Jean's "medical issues (mental and physical) [were] being treated with medication and therapy." In fact, Jean's .5mg Risperidone remained significantly lower than that which he'd previously been prescribed (1mg - 2mg per day).

83. Jean spoke with Dr. Gonzalez Cadavid, the tele-psychiatrist assigned to SDC, only once. His follow-up appointment was rescheduled because of other detained immigrants' "more acute" needs.

84. By April 11, 2017, Jean reported to ICE officials, "I am now hearing voices almost every day and they are starting to bother me." He explained the voices were "cluttering his thoughts, distracting his focus, intruding on [his], calmness, and way of being.'" He explained to the Clinical Social Worker that the voices sometimes tell him to "do some impulsive stuff like run 10 miles and walk out of the shower without clothes on. They want to control my art by telling me who to listen to."

16

85. Then, on April, 13, 2017, Jean was punched in the face repeatedly and kicked in the groin by another detained immigrant inside the day room of his pod, in full view of cameras.

86. In violation of ICE's binding policies governing placement of individuals with serious mental illness in segregation, ICE's policies governing review of administrative segregation, and ICE's policies governing prevention of significant self-harm and suicide, Defendant Bretz and Defendant Gallagher personally failed to conduct a review of Jean's placement in administrative segregation until April 18, and Jean was not released from solitary confinement until April 19, 2017.

87. The same Jean emerged from his first six days in solitary confinement for an offense with which he was never charged, he sought medical care and told ICE officials he was experiencing auditory hallucinations.

88. On April 25, 2017, Jean once again saw a medical provider and sought an increase to his medication. The Nurse Practitioner who saw Jean noted, and Defendants Gallagher and Bretz were notified, of the following encounter:

> Provider observed patient sitting in the waiting area jump out of his seat repeatedly stating he was "Caesar of the Romans." Patient reports hearing voices during the night which was voices of the Romans telling him to commit suicide. Since the dream and hearing the voices last night patient advised he was told he is Caesar of the Romans. Patient advised the voices did not tell him what to do or how to kill himself. Patient states he does not have a desire to harm himself or anyone else. Patient advised he needed strong MH medication because he does not believe the amount he is taking is effective. Patient previously saw the MS provider before this encounter. Patient have [sic] a future appointment with Dr. Cadavid. Dr. Cadavid reviewed labs that had elevated prolactin on 3/23/17. Elevated Prolactin maybe the result of the patient taking risperidone. Patient arrived at Stewart ICE Processing Center on 3/07/17.

89. The provider noted Jean "admits to hearing voices and the voices telling him he need to commit suicide. States the voices are not telling him how or what to do to carry the act out."

90. Despite this clear warning, and their ongoing obligations under ICE's binding policies and procedures to monitor Jean's mental health on at least a weekly basis, Defendants Gallagher and Bretz

took no actions to provide emergency mental health intervention to Jean, to ensure that his dosage was increased, or to transfer him to psychiatric facility for stabilization.

**D. Defendants Punish Jean with Prolonged Solitary Confinement for Attempting to Harm Himself.**

91. On April 25, 2017, Jean jumped from the top-tier walkway in his dorm to the ground level and then exposed himself to the other people detained in the pod's dayroom. When he was asked by correctional staff why he did so, he told them it was in an effort to harm himself.

92. Despite their knowledge of his serious medical condition and the specific risks solitary confinement posed to him, Defendants Gallagher and Bretz personally approved of a sentence of prolonged disciplinary segregation as punishment for this act of attempted self-harm.

93. The United Nations Special Rapporteur on Torture "defines prolonged solitary confinement as any period of solitary confinement in excess of 15 days." *Interim report of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading treatment or punishment*, delivered to the United Nations General Assembly August 5, 2011, U.N. Doc A/66/268 at 22 ¶ 79  (Aug. 5, 2011) *available at* http://solitaryconfinement.org/uploads/SpecRapTortureAug2011.pdf

94. The Special Rapporteur concluded both prolonged solitary confinement and placement of persons with mental disabilities into solitary confinement "can amount to torture or cruel, inhuman and degrading treatment or punishment." *Id.* at 22 ¶ 81.

95. Defendant Gallagher and Defendant Bretz personally signed off on Jean's continued detention in solitary confinement on multiple occasions during this period, despite the known, documented risks of placing a previously suicidal person suffering from acute psychosis, auditory hallucinations, even as his condition worsened to reach a crisis point.

96. On May 2, 2017, Jean told officials in the solitary confinement area that he wanted to cut himself.

97. Later in the day, he did what he had previously explained to ICE personnel the voices in his head would tell him to do during command hallucinations and exposed himself to staff in the segregation pod.

98. The ICE Health Service Administrator responsible for all medical care at Stewart documented that Jean "should be held accountable for his behavior when it is clearly inappropriate in nature to reduce the likely hood [sic] of repeated behavior by this detainee or other detainees who witnessed it."

99. To mete out this punishment Defendant Bretz approved of an additional period in solitary confinement as punishment, and Defendant Gallagher personally concurred in this placement.

100.    Another ICE official threatened Jean that the Immigration Judge would be told about his behavior and it could affect his case if he continued to act out.

101.    By this time, Jean was consistently referring to himself as "Julius Caesar" and explaining to staff, other detained immigrants, and even and ICE prosecutor during an on-the-record exchange in Immigration Court, "I am Julius Caesar FOR REAL."

102.    On May 10, 2017, Nurse Shuntelle Anderson observed Jean standing on the toilet, beating on the wall. She approached him and asked what was going on. Jean told her he was hearing voices, "They keep trying to control my every move, my drawing, my thinking, all of my actions. . . . I am just fucking tired of hearing these voices, they keep trying to control my every fucking move and it is annoying as fuck."

103.    Jean once again complained about the inadequacy of the medication he was receiving. "I told Calvery that my medication needs to be increased, she has yet to get around to doing it." Then, in the midst of the encounter, Jean "began punching the wall again, yelling 'just leave me the fuck alone.'" Nurse Anderson asked Jean again if the voices wanted him to harm himself or anyone else, Jean told her: "Yeah, they want me to commit suicide because the people here are simple, but don't want to harm myself or anyone else."

104.     Nurse Anderson documented this encounter and notified the Licensed Clinical Social Worker after hours.

105.     Defendants Gallagher and Bretz had access to this notification and were under a legal duty to review it during their periodic reviews of Jean's continued placement in solitary confinement as required by ICE's non-discretionary policy directives. Still, they took no action, and elected instead to continue punishing Jean with prolonged solitary confinement as retribution for the behaviors he displayed and to deter others from imitating those behaviors.

106.     On the night Mr. Jimenez died, facility personnel reportedly observed him inside his solitary confinement cell using his bedsheet as a jump rope just hours before he would tie the sheet to an exposed sprinkler head and hang himself. A cursory glance inside the solitary confinement cell would have revealed to officers that Mr. Jimenez had written "Hallelujah The Grave Cometh" in large, dark letters on the wall.

107.     Following Jean's death, Defendants Gallagher and Bretz oversaw the creation and dissemination of false information regarding Jean's death which bear on the jury's consideration of Plaintiffs' request for punitive damages.

108.     First, they, and acting in concert with at least one John Doe ICE agent, falsely claimed to the Georgia Bureau of Investigation that Jean "was just horsing around" when he jumped from the second tier walkway. Defendant Bretz personally reviewed and signed the disciplinary form reflecting that Jean attempted he was attempting to harm himself, and was being punished with solitary confinement as a result.

109.     Second, Defendant Gallagher stated in a press interview that if there had been any indication Jean was at risk for suicide and suffering from mental illness while in ICE custody at SDC, there would have been a specific response to that. Defendant Gallagher's words left the false

impression that no so indications existed, notwithstanding the abundant records showing that they did.

110.     Third, Defendant Gallagher has continuously conveyed in public statements that ICE holds its staff and contractors to the highest standards at SDC, and that the care and well-being of detained immigrants there is being ensured by ICE and his office—factual assertions that are impossible to square with the record of Jean's experience, and the ongoing, systemic problems documented by the Office of Inspector General and largely agreed upon by ICE.

111.     Fourth, no later than May 17, 2017, Defendants Gallagher, Bretz, and a John Doe ICE agent caused to be transmitted to investigators and ICE officials in Washington, D.C. a summary of Jean's medical records that made material omissions of the records of his treatment and care, leaving the false impression that Jean was not being punished with solitary confinement for behaviors that were the direct, admitted result of his diagnosed mental illness, and its rapid deterioration due to under-medication and lack of necessary care from the day he arrive at SDC.

112.     Fifth, no later than June 2, 2017, John Doe ICE agent, with, upon information and belief, the assistance of Defendant Gallagher, worked to suspend the mandatory Immigrant Health Services Corps Mortality Review, indicating to ICE contractors and at least some staff at SDC that such review had been put on hold—an occurrence completely outside the normal, policy-based response to a death in custody.

113.     In sum, Defendants Gallagher and Bretz were deliberately indifferent to Jean's serious medical need and the grave risk their inaction posed. Their deliberate indifference was the predictable and actual cause of his pre-death suffering, and ultimately, his death.

114.     The actions of Defendants Gallagher and Bretz in punishing Jean with solitary confinement for attempting to harm himself and then for acting on the auditory hallucinations they refused to help control with medication and treatment constitute torture and cruel, inhuman, and

degrading treatment as defined by well-established customary international law and binding treaty obligations to which the United States is a party.

115.     Defendants' torture and cruel, inhuman, and degrading treatment of Jean as punishment for his mental illness caused him severe physical and mental pain and suffering, and ultimately, caused his death.

### CLAIMS FOR RELIEF

#### COUNT ONE
#### 28 U.S.C. § 1350, ALIEN TORT STATUTE
#### TORTURE AND OTHER CRUEL, INHUMAN, AND DEGRADING TREATMENT

116.     Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

117.     The Alien Tort Statute, enacted in 1789, permits non-citizens to bring suit in U.S. courts for violations of the law of nations or a treaty of the United States. Under the ATS, federal courts are authorized to recognize a common-law cause of action for violations of clearly defined, widely accepted human rights norms. *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).

118.     The Convention Against Torture and Other Cruel Inhuman and Degrading Treatment constitutes a clearly defined, widely accepted human rights norm. The United States is a party to the Convention, and has implemented its obligations in domestic law. *See, e.g.*, 8 C.F.R. § 208.18.

119.     Defendants' conduct described herein constitutes torture and cruel, inhuman, and degrading treatment, a violation of "specific, universal, and obligatory" international law norms, as evidenced by numerous binding international treaties, declarations, and other international law instruments. *Sosa*, 542 U.S. at 732. Accordingly, Defendants' conduct is actionable under the ATS.

120.     Defendants Gallagher, Bretz, and John Doe ICE Agents 1-10 tortured Jean and subjected him to cruel, inhuman, and degrading treatment under color of law by intentionally inflicting

severe physical and mental pain and suffering upon him for the purpose of punishing him, intimidating him, or coercing him under color of law.

121.    Specifically, Defendants knew of Jean's placement in prolonged solitary confinement as punishment for jumping off a top-tier walkway in a self-described attempt at self-harm.

122.    Defendant Bretz personally approved Jean's placement in disciplinary segregation for month than 14 days as punishment for actions Jean described during his segregation review as an attempt to harm himself.

123.    Defendant Gallagher personally approved of this placement at the time it was made, and re-approved of it on at least a weekly basis after the decision was made.

124.    Defendants subjected Jean to prolonged solitary confinement specifically intending to cause him severe mental or physical pain and suffering sufficient to alter his behavior and deter others in SDC from engaging in similar behaviors.

125.    These Defendants were specifically aware that Jean's period of solitary confinement was extended as punishment for a mental health-related disciplinary infraction, but approved prolonging his solitary confinement sentence nonetheless.

126.    These Defendants are further liable for torture and cruel, inhuman and degrading treatment because they sent or personally received the required notifications detailing Mr. Jimenez's placement in prolonged solitary confinement, and although they were aware of his serious mental illness and risk for suicide, they personally approved or caused to be approved his continued placement in disciplinary segregation as punishment for his attempt at self-harm and mental health-related disciplinary infractions.

127.    As part of an ongoing pattern and practice of torturing detained immigrants with serious mental health issues by using prolonged solitary confinement as discipline for mental health-related behaviors, these Defendants disregarded ICE's required medical review and reporting

mechanisms to ICE headquarters upon being made aware of Jean's placement in solitary confinement, which ensured Jean's continued, prolonged solitary confinement even as his mental health rapidly deteriorated.

128.    These Defendants intended to cause Jean severe physical or mental pain and suffering in order to punish him for perceived disciplinary infractions that were related to his compromised mental health, and to deter other detained immigrants from engaging in similar disciplinary infractions.

129.    These Defendants are further liable because they aided and abetted Jean's torture and cruel, inhuman, and degrading treatment by other parties, including Immigrant Health Services Corps ("IHSC") contractors and personnel.

130.    These Defendants' acts and omissions caused Jean to suffer damages, including severe physical, mental, and emotional pain and suffering, and ultimately, death.

131.    These Defendants acts and omissions were deliberate, willful, intentional, wanton, malicious, oppressive, and in conscious disregard for Jean's rights under international and U.S. law and should be punished by an aware of punitive damages in an amount to be determined at trial.

132.    No absolutely or qualified immunity exists to shield these Defendants from liability.

**COUNT TWO**
**U.S. CONST. AMEND. V.**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED**
*BIVENS V. SIX UNKNOWN NAMED AGENTS OF THE FEDERAL BUREAU OF NARCOTICS*
**403 U.S. 388 (1971) &** *CARLSON V. GREEN*, **446 U.S. 14 (1980)**

133.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

134.    Jean mental health diagnoses of acute psychosis, schizoaffective disorder-bipolar presented a serious medical need.

135.     His documented mental health history included a history of suicide attempts in custody, involuntary commitments, auditory hallucinations, including command hallucinations, visual hallucinations, and suicidal ideation.

136.     Defendants Gallagher, Bretz, and John Doe ICE Agents 1-10 knew that Jean had a serious medical need posing a serious risk of harm.

137.     Defendant Gallagher was personally aware beginning on or about February 5, 2017, of Jean's history of "erratic behavior" as documented by Designated Immigration Officer Ramos at the Wake County Jail. He was aware of Jean's mental health diagnoses, past suicide attempts and involuntary commitments, and placement on suicide watch almost immediately after arrive at SDC no later than March 8, 2017. He was aware that Jean had contacted the DRIL seeking help for his mental health issues no later than April 5, 2017. Defendant Gallagher was made aware of Jean's placement in solitary confinement for administrative segregation following the attack on him by a fellow detained immigrant no later than 72 hours after Jean was placed in solitary confinement on April 13, 2017. Defendant Gallagher was aware that Jean had once again been placed in solitary confinement on for a prolonged period of time for attempting to harm himself on April 27, 2017. Defendant Gallagher was aware of the increase in Jean's period in solitary confinement as punishment on May 2, 2017. And Defendant Gallagher was aware that Jean remained in solitary confinement despite his deteriorating mental health condition by virtue of his receipt from ICE officials at SDC of periodic lists of individuals in solitary confinement with mental health issues.

138.     Defendant Bretz was personally aware beginning on or about March 8, 2017 that Jean had a serious medical condition that posed a risk of serious harm if left untreated. Throughout Jean's detention at SDC, Defendant Bretz was made aware of his requests for additional medical treatment and need for additional psychiatric monitoring and medication. Defendant Bretz was personally aware of Jean's placement in administrative segregation for an unlawfully prolonged period of time following

his attack by a fellow detained immigrant on April 13, 2017. Defendant Bretz personally approved of Jean's prolonged solitary confinement period as punishment for his attempt to harm himself on April 27, 2017. Defendant Bretz personally approved the extension of Jean's time in prolonged solitary confinement on or about May 2, 2017. And Defendant Bretz was personally aware of the ongoing occurrence of command hallucinations Jean experienced in which he reported hearing voices telling him to kill himself while he was in prolonged solitary confinement.

139.     Defendant John Doe ICE Agents 1-10 were personally aware of Jean's serious medical condition, and the risk of serious harm it posed. One or more of these Defendants served as Jean's Deportation Officer and personally visited him on a regular basis to serve paperwork, court notices, and respond to inquiries about the detention and removal process. One or more of these Defendants was personally responsible for responding the DRIL inquiry from ICE Headquarters, which required a thorough review of Jean's medical records and detention records. One or more of these officers reported Jean's placement in solitary confinement to Defendant Bretz and/or Defendant Gallagher on a regular basis in compliance with ICE's mandatory reporting and review requirements for individuals with serious mental illness who are placed in disciplinary segregation.

140.     Defendants failed to provide the necessary medical care for Jean's serious medical need in deliberate indifference to the serious risk of harm.

141.     Specifically, Defendants Gallagher, Bretz, and John Does 1-10 failed to:

   a.   Consider less restrictive, more medically appropriate alternatives to detention at Stewart based Jean's serious mental illness, as required by binding ICE policies;

   b.   Recommend transfer to an outside mental health facility upon learning of Jean's attempts at self-harm;

   c.   Secure vital mental health and detention records from Wake County, North Carolina in order to comply with ICE's binding policy governing competency determinations in Immigration Court.

    d.   Evaluate all less restrictive alternatives to solitary confinement in determining whether Jean should be placed in disciplinary segregation or provided some alternative form of intervention, as required by ICE's binding policies;

    e.   Arrange for prompt tele-psychiatry on the multiple occasions Jean expressed a desire to harm himself or displayed erratic, rules-violating behavior consistent with his self-described command hallucinations;

    f.   Place Jean on 15-minute mental health checks despite his classification as being at risk of suicide or other serious self-harm;

    g.   Ensure Jean was placed on suicide watch or mental health observation after he repeatedly expressed that he was suffering from auditory hallucinations telling him to commit suicide;

    h.   Verify that all medical and contract personnel who cared for Jean knew of the acute risk of suicide his active auditory hallucinations posed and ensure that all necessary precautions were taken to mitigate the risk of a successful suicide attempt;

    i.   Thoroughly and timely communicate the facts of Jean's serious mental health needs and the extreme discipline Defendants Bretz and Gallagher meted out to medical and custody professionals at ICE Headquarters, thus preventing interventions at multiple stages;

142.    Defendants Gallagher and Bretz personally knew of the specific risks to Jean's life, safety, and mental health posed by ICE's critically low staffing levels at SDC, failed to reduce the daily population so that individuals such as Jean could receive the necessary medical and mental health treatment and segregation monitoring.

143.    Defendants Gallagher and Bretz personally knew of the specific risks to Jean's life, safety, and mental health posed by the defects and shortcomings in the physical space at SDC—specifically, the fact that solitary confinement cells like the one Jean died in did not have suicide-resistance sprinkler heads, that the physical structure of SDC did not offer sufficient space to conduct necessary mental health observation in a medical, instead of punitive solitary confinement setting, and that audio and video monitoring of detained immigrants like Jean by mental health or medical professionals would greatly reduce the risk of suicide. Despite this personal knowledge, Defendants Gallagher and Bretz failed to execute the agreement drafted over a year before Jean's death to correct

27

these fundamental, deadly defects in the physical plant at SDC. Instead, they signed the long-drafted agreement days after Jean died.

144.     Defendants' acts and omissions caused Jean to suffer damages, including severe physical, mental, and emotional pain and suffering prior to his death, and ultimately, his death.

145.     Defendants acts and omissions were deliberate, willful, intentional, wanton, malicious, oppressive, and in conscious disregard for Jean's rights and should be punished by an aware of punitive damages in an amount to be determined at trial.

146.     Defendants Gallagher and Bretz violation Jean's clearly established constitutional right, of which any reasonable officer would be aware to be free from deliberate indifference to his serious medical need while involuntary confined in civil immigration detention. Accordingly, this Court has jurisdiction over Plaintiffs' deliberate indifference claims, and neither Defendant is entitled to qualified immunity.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1.   Enter judgment in favor of Plaintiff and against all Defendants.

2.   Award Plaintiffs nominal, compensatory, and punitive damages in an amount to be determined by a jury at trial.

3.   Award Plaintiffs such further relief as the Court deems just, equitable, and appropriate.


Date: May 16, 2019                    Respectfully submitted,

**/s/G. Brian Spears**
G. Brian Spears, Ga. Bar No. 670112
G. Brian Spears, P.C.
1126 Ponce De Leon Ave. NE
Atlanta, Georgia 30306
(404) 872-7086 (tel)
(404) 892-1128 (fax)

bspears@brianspearslaw.com


/s/ R. Andrew Free*
**R. ANDREW FREE, No. 30513**
P.O. Box 90568
Nashville, TN 37209
Tel. 844-321-3221
Fax: 615-829-8959
Andrew@immigrantcivilrights.com
*Counsel for the Plaintiff*

*\*Application to Plead and Practice* Pro Hac Vice
*Forthcoming*