IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| GILBERTO RODRIGUEZ CHAVERRA, *as Administrator of the Estate of Jeancarlo Alfonso Jimenez Joseph*, and NERINA JOSEPH, *As Mother and Next-of-Kin of Jeancarlo Alfonso Jimenez Joseph*,<br><br>  Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>  Defendant. | *<br>*<br>*<br>*<br>*<br>*   CASE NO. 4:19-CV-81 (CDL)<br>*<br>*<br>*<br>*<br>* |

O R D E R

Jeancarlo Alfonso Jimenez Joseph ("Jimenez") died inside a solitary confinement cell while in U.S. Immigration and Customs Enforcement custody at Stewart Detention Center in Lumpkin, Georgia on May 15, 2017. In this action under the Federal Tort Claims Act, Jimenez's mother asserts a wrongful death claim, and the administrator of Jimenez's estate asserts claims for the injuries Jimenez suffered before he died. The Government contends that some of Plaintiffs' claims are time-barred and that Plaintiffs' claims must be dismissed under the independent contractor exception to the Federal Tort Claims Act. For the reasons set forth below, the Court denies the Government's motion to dismiss (ECF No. 20).

MOTION TO DISMISS STANDARD

The Government seeks dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). The Government contends that this Court lacks subject matter jurisdiction over some of Plaintiffs' claims because they are time-barred under the Federal Tort Claims Act. A panel of the Eleventh Circuit noted that "the Supreme Court made clear that the time bars in the [Federal Tort Claims Act] 'are nonjurisdictional and subject to equitable tolling.'" *Harris v. United States*, 627 F. App'x 877, 878-879 (11th Cir. 2015) (per curiam) (quoting *United States v. Wong*, 575 U.S. 402, 420 (2015)). That panel treated a motion to dismiss based on the Federal Tort Claim Act's time bar "as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Id.* at 879. This Court will do the same.[1]

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

---

[1] The Government does not assert a factual challenge to Plaintiffs' Complaint based on the statute of limitations. Rather, the Government argues that even if all of Plaintiffs' allegations are accepted as true, certain claims are still time-barred. The Government does assert, based on facts that are not in the Complaint, that the independent contractor exception applies to some or all of Plaintiffs' claims, but the Government does not seriously dispute that this issue would be more appropriately decided on a motion for summary judgment after discovery.

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint must include sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  In other words, the factual allegations must "raise a reasonable expectation that discovery will reveal evidence of" the plaintiff's claims.  *Id.* at 556.  But "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable.'"  *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556).

## FACTUAL ALLEGATIONS

Plaintiffs allege the following facts in support of their claims.  The Court must accept these allegations as true for purposes of the pending motion.

In 2016, when Jimenez was twenty-six years old, Jimenez was diagnosed with psychosis after he reported auditory and visual hallucinations, thoughts of suicide, and an inability to control his actions in the face of command hallucinations.  Am. Compl. ¶¶ 21-22, ECF No. 16.  Between August 2016 and January 2017, Jimenez was arrested and held by the Wake County Sheriff's Office in North Carolina four separate times.  *See id.* ¶¶ 24-31.  During these periods of incarceration, Jimenez displayed erratic behavior, reported his diagnosis of acute psychosis, was noted as

having a diagnosis of schizophrenia that was treated with medication, reported that he had previously attempted suicide, was placed in protective custody and on suicide watch, disclosed that he had been hospitalized in a mental health facility, reported that he believed someone was putting thoughts into his head, and was found in his cell attempting to hang himself with a noose he had made from a bedsheet. *Id.*

Jimenez was involuntarily committed twice between October 2016 and January 2017. In October 2016, during his second period of incarceration, the Wake County Sheriff's Office involuntarily committed Jimenez after he reported auditory hallucinations and a plan to commit suicide by drowning himself in the toilet of his cell. *Id.* ¶ 27. During his court-ordered inpatient mental health treatment, Jimenez disclosed two prior suicide attempts, including one by hanging. *Id.* Then, in January 2017, after the Wake County Sheriff's Office released Jimenez from his fourth period in custody, Jimenez's mother took him to seek inpatient treatment for psychosis and schizophrenia. *Id.* ¶ 32. Jimenez was involuntarily committed and remained in the hospital until January 25, 2017. *Id.* ¶ 33.

Jimenez was returned to custody of the Wake County Sheriff's Office on February 5, 2017. He was immediately placed in protective custody, with notes that he had a history of mental health-related behavior. *Id.* ¶ 34. A designated immigration

4

officer (a Wake County Sheriff's Office employee performing certain functions of a federal immigration officer) encountered Jimenez, who had been a recipient of Deferred Action for Childhood Arrivals. He reviewed Jimenez's detention and involuntary commitment history and noted on U.S. Immigration and Customs Enforcement ("ICE") forms that Jimenez had previously displayed erratic and strange behavior while incarcerated in Wake County. ICE Atlanta Field Office Director Sean Gallagher approved arresting and detaining Jimenez as a federal interest. *Id.* ¶ 36. Jimenez entered ICE custody and was transferred to Stewart Detention Center on March 7, 2017. *Id.* ¶ 37.

When Jimenez arrived at Stewart Detention Center, ICE officials placed Jimenez on suicide watch "because he endorsed auditory hallucinations, active suicidal ideation, a history of suicide attempts, and prior inpatient treatments for schizophrenia and psychosis during his ICE medical screening." *Id.* ¶ 38. ICE officials, including Gallagher and Stewart Detention Center Assistant Field Office Director John Bretz, were aware of Jimenez's placement on suicide watch and the reasons for it. *Id.* ¶¶ 38-39. They were also aware that Stewart Detention Center suffered from chronic shortages of medical staff positions; only one of the four required behavioral health positions in Stewart Detention Center's staffing plan was filled, there was no on-site psychiatrist, and

5

there was only one licensed clinical social worker responsible for treating the nearly 2,000 detainees. *Id.* ¶¶ 41–59.

Jimenez was released from mental health observation and into the general population. While at Stewart Detention Center, Jimenez received a much lower dosage of the schizophrenia medication than had previously been effective. ICE law enforcement officials and medical personnel with ICE's Immigrant Health Services Corps ("IHSC") documented that on ten separate occasions between March 14 and May 10, 2017, Jimenez requested an increase in his medication because the voices in his head were getting worse. *Id.* ¶ 62. Jimenez repeatedly reported to ICE and IHSC personnel that he was experiencing auditory hallucinations.[2] *Id.* ¶¶ 62, 68. He disclosed that the voices told him to do impulsive things like walk out of the shower with no clothes on (which he did on at least one occasion). *Id.* ¶¶ 64, 68. Jimenez also called a detention reporting and information line to complain that he was suffering from serious mental illness and not receiving proper treatment. *Id.* ¶ 66. Gallagher and Bretz falsely responded that Jimenez's medical issues were being treated with medication and therapy.

---

[2] In the Amended Complaint, Plaintiffs make allegations about the acts and omissions of specific ICE and IHSC employees, and they make allegations about the acts and omissions of "ICE law enforcement officers" and "IHSC medical personnel." "ICE law enforcement officers" include Gallagher, Bretz, ICE Public Health Service Administrator James Blankenship, and their ICE subordinates. Am. Compl. ¶¶ 37, 106. "IHSC medical personnel" includes licensed social worker Lt. Commander Kimberly Calvery and other IHSC employees who served at Stewart Detention Center. *Id.* ¶ 119.

*Id.* While he was at Stewart Detention Center, Jimenez spoke with the tele-psychiatrist only once; although he was supposed to have a follow-up appointment, it was rescheduled to accommodate other detainees. *Id.* ¶ 67.

Jimenez was placed in solitary confinement after an April 13, 2017 incident during which another inmate punched Jimenez in the face and repeatedly kicked him in the groin. *Id.* ¶ 69. When Jimenez was released from solitary confinement on April 19, he sought medical care and told ICE officials that he was experiencing auditory hallucinations. A few days later, Jimenez saw a nurse practitioner, who noted that Jimenez reported hearing voices telling him to commit suicide and that his mental health medication was not effective. *Id.* ¶ 72. ICE law enforcement officials were notified of this encounter between Jimenez and the nurse practitioner. *Id.* ICE law enforcement and IHSC medical personnel took no action to provide additional mental health care for Jimenez, such as increased mediation or transfer to a psychiatric facility for stabilization.

On April 27, 2017, Jimenez jumped from a top-tier walkway to the ground level and then exposed himself to other detainees. He told correctional staff that he did these things in an effort to harm himself. *Id.* ¶ 75. ICE law enforcement and IHSC medical personnel knew about Jimenez's serious medical condition and that solitary confinement posed significant risks to him, but they

7

personally approved a sentence of prolonged disciplinary segregation as punishment for Jimenez's actions. *Id.* ¶ 76. "ICE law enforcement and IHSC medical personnel personally signed off on Jimenez's continued detention in solitary confinement on multiple occasions during this period, despite the known, documented risks of placing a previously suicidal person suffering from acute psychosis, auditory hallucinations, and schizophrenia in solitary, and even as his condition worsened to reach a crisis point." *Id.* ¶ 79. In early May, Jimenez exposed himself to staff members in the segregation pod, and the IHSC health service administrator documented that Jimenez "should be held accountable for his behavior when it is clearly inappropriate in nature." *Id.* ¶¶ 81-82. To punish Jimenez for his conduct, Bretz approved of additional solitary confinement, and Gallagher concurred. *Id.* ¶ 83.

On May 10, 2017, an IHSC contract nurse observed Jimenez punching the wall in his solitary confinement cell. Jimenez reported that he was hearing voices and that they were trying to control his actions. *Id.* ¶ 86. Jimenez also told the nurse that the voices wanted him to commit suicide. *Id.* ¶ 87. The nurse documented this encounter and notified the licensed clinical social worker. ICE law enforcement and IHSC medical personnel had access to this notification and were obligated to review it during their periodic reviews of Jimenez's continued placement in

8

solitary confinement, but they took no action. *Id.* ¶ 89. Hours before he died, Jimenez was observed using his bedsheet as a jump rope, and he wrote "Hallelujah the Grave Cometh" in large dark letters on the wall. *Id.* ¶ 90. On May 15, 2017, Jimenez tied his bedsheet to an exposed sprinkler and hanged himself. *Id.*

After Jimenez's death, ICE officials told the Georgia Bureau of Investigation that Jimenez was just "horsing around" when he jumped from the second-tier walkway, even though the disciplinary form that Bretz signed stated that Jimenez was attempting to harm himself and was being punished with solitary confinement as a result. *Id.* ¶ 92. Gallagher or his designee participated in a press interview about Jimenez's death and stated that if there had been any indication that Jimenez was at risk for suicide and suffering from mental illness, there would have been a response. *Id.* ¶ 93. When Gallagher, Bretz, and their subordinates sent a summary of Jimenez's medical records to ICE investigators in Washington, DC, they omitted material facts, left the false impression that Jimenez was not being punished for behaviors that were the direct result of his diagnosed mental illness, and did not disclose his rapid deterioration due to lack of care. *Id.* ¶ 95. ICE's External Reviews and Audits Unit conducted a detainee death review and noted more than "two dozen violations of ICE's non-discretionary rules," including failure to follow ICE's

suicide prevention standards. *Id.* ¶ 99.[3] IHSC investigators also conducted a review and concluded that because Jimenez's symptoms were becoming progressively worse, his "prescribed psychotropic regimen was not at a therapeutic level," and Stewart Detention Center "did not have adequate psychiatry resources" to manage Jimenez, it would have been best practice to refer Jimenez to another facility so he could receive adequate psychiatry services. *Id.* ¶ 104. Plaintiffs allege that "[t]he manifest failures of Gallagher, Bretz, [ICE Public Health Service Administrator James] Blankenship, [licensed social worker Lt. Commander Kimberly] Calvery, and other ICE law enforcement and IHSC medical personnel to comply with ICE's own binding policies ultimately resulted in [Jimenez]'s death." *Id.* ¶ 106.

Plaintiffs presented their administrative claims to the Department of Homeland Security on May 15, 2019. The Government does not dispute that the claims were presented within two years after Jimenez's death and does not seek dismissal of Plaintiffs' wrongful death claim as untimely. The Government does argue that Plaintiffs' claims brought on behalf of Jimenez's estate for pre-death injuries are barred by the statute of limitations.

---

[3] Plaintiffs attached the report to their Complaint. There is no allegation of when Plaintiffs received it, but it could not have been before July 2017 since it references a July 2017 autopsy report.

DISCUSSION

## I.  Are Plaintiffs' Negligence and Emotional Distress Claims Time-Barred?

Plaintiffs cannot sue the United States unless the United States has waived its sovereign immunity.  When Congress enacted the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* ("FTCA"), it authorized "a limited waiver of sovereign immunity for tort claims" based on the conduct of federal employees acting within the scope of their employment.  *Knezevich v. Carter*, 805 F. App'x 717, 724 (11th Cir. 2020) (per curiam) (citing *Motta ex rel. A.M. v. United States*, 717 F.3d 840, 843 (11th Cir. 2013) and 28 U.S.C. § 1346(b)(1)).  "The limited waiver of sovereign immunity is strictly construed in favor of the United States."  *Id.* (citing *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 491 (2006)).  "A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . ." 28 U.S.C. § 2401(b).  "The general rule is that a claim under the FTCA accrues at the time of injury."  *Diaz v. United States*, 165 F.3d 1337, 1339 (11th Cir. 1999) (citing *United States v. Kubrick*, 444 U.S. 111, 120 (1979)).

The administrator of Jimenez's estate asserts claims for negligence that resulted in pre-death injuries to Jimenez and for intentional infliction of emotional distress to Jimenez.  The

11

Government argues that these claims should be dismissed "in whole or part" as time-barred.  Def.'s Mot. to Dismiss 6, ECF No. 20. To provide analytical clarity, the Court finds it helpful to place the estate's pre-death claims into two separate categories—the claim for Jimenez's pain and suffering during that brief period of his strangulation on May 15, 2017 until the time of his death and those claims for Jimenez's various injuries that occurred prior to May 15, 2017.

The strangulation claim accrued when Jimenez experienced the pain and suffering during the strangulation, which Plaintiffs allege was caused by a series of decisions by ICE and IHSC personnel that reflect a continued disregard of Jimenez's mental health condition and his risk of suicide.  *See Diaz*, 165 F.3d at 1339 ("The general rule is that a claim under the FTCA accrues at the time of injury."). Thus, the statute of limitations for that claim began to run on May 15, 2017.  Since the administrative claim was presented within two years after that date, it was timely.

The statute of limitations analysis for the pre-May 15, 2017 claims is more complicated.  Because the injuries supporting those claims occurred more than two years before the administrative claim was presented, those claims are barred, unless the two-year statute of limitations was tolled or the Plaintiffs could not have discovered a causal connection between the conduct of the

12

Government's employees and Jimenez's injuries until after May 15, 2017.

In support of their argument that the statute of limitations was tolled, Plaintiffs rely upon O.C.G.A. § 9-3-92, which tolls the statute of limitations for unrepresented estates in Georgia until an administrator is appointed.  Although the Eleventh Circuit has not directly addressed whether O.C.G.A. § 9-3-92 tolls the FTCA's two-year statute of limitations, the Court finds that O.C.G.A. § 9-3-92 does not apply to FTCA claims.  Accrual of a cause of action under the FTCA is a matter of federal law, and the FTCA does not incorporate expressly or by implication state law tolling provisions.  *Mendiola v. United States*, 401 F.2d 695, 697-98 (5th Cir. 1968) (rejecting argument that state tolling provision tolled the statute of limitations pending termination of the plaintiff's workmen's compensation suit);[4] *see also Phillips v. United States*, 260 F.3d 1316, 1318-19 (11th Cir. 2001) (concluding that Georgia's renewal statute does not apply to the FTCA statute of limitations); *Ramos v. U.S. Dep't of Health & Human Servs.*, 429 F. App'x 947, 952 (11th Cir. 2011) (per curiam) (finding that ninety-day extension in the limitations period under Florida law

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

did not apply to the FTCA). Accordingly, O.C.G.A. § 9-3-92 does not save these claims.

Plaintiffs do not rely solely upon Georgia's tolling statute to rescue their claims based on pre-May 15, 2017 injuries. They also point to the general principle that a claim does not accrue for statute of limitations purposes until the plaintiff discovered the injuries and their causal connection to tortious conduct by Government employees. In certain situations, such as medical malpractice, an FTCA claim may accrue after the injury date. *Diaz*, 165 F.3d at 1339. "The rule for medical malpractice claims is that they accrue when the plaintiff knows of both the injury and its cause." *Id.* "The rationale behind the modified rule is to protect plaintiffs who are blamelessly unaware of their claim because the injury has not yet manifested itself or because the facts establishing a causal link between the injury and the medical malpractice are in the control of the tortfeasor or are otherwise not evident." *Id.* Although a plaintiff may not "bury her head in the sand once she is put on notice that the government may have caused an injury," she "will not automatically lose her claim . . . merely because the circumstances surrounding the injury make its existence or governmental cause not reasonably knowable." *Id.* In summary, "a medical malpractice claim under the FTCA accrues when the plaintiff is, or in the exercise of reasonable diligence should be, aware of both her injury and its connection with some act of

14

the defendant."  *Id.* (quoting *Price v. United States*, 775 F.2d 1491, 1494 (11th Cir. 1985)).

The Court is skeptical as to whether this "discovery" principle should apply under these circumstances.  But Eleventh Circuit precedent suggests that it does.  In *Diaz*, the plaintiff's husband committed suicide by hanging himself with a bedsheet, just like Jimenez did.  Prison officials told the plaintiff "that they were shocked by her husband's suicide and had no warning that he might kill himself."  *Id.* at 1338.  A year and a half later, the plaintiff received a copy of a police investigation report which indicated that the plaintiff's husband had received psychological evaluation at the prison after he reported a number of symptoms, including suicidal ideation.  That was the first indication that the plaintiff had received medical treatment for psychological symptoms before he died.  The Eleventh Circuit found that the diligence-discovery rule applied and remanded for a determination of when the plaintiff's claims accrued, noting that "the date of accrual will be either the date that [the widow] obtained actual knowledge of the government's medical and psychological treatment of her husband or the date that a person in her situation and exercising reasonable diligence should have known that he was treated."  *Id.* at 1341.  The Eleventh Circuit noted: "Suicides, regrettably, do take place in prisons.  Mere knowledge of such a suicide, without any indication of medical treatment beforehand,

15

is clearly not enough to put a plaintiff on notice that medical malpractice may have occurred." *Id.*

The Court recognizes that *Diaz* involved only a wrongful death claim and not a claim by the estate for pre-death injuries. But the Court cannot find anything in the Circuit Court opinion to suggest that this distinction makes a difference. The Court clearly stated that an FTCA claim does not accrue until the plaintiff is aware of both his injury and its connection with some act of the defendant. Here, the present record does not establish when Jimenez's family, including his stepfather/estate administrator, knew or should have known that Jimenez was placed in solitary confinement for conduct related to his mental illness or that Jimenez received psychiatric care at Stewart Detention Center. Although Plaintiffs knew that Jimenez had psychosis and schizophrenia and that Jimenez committed suicide, they assert that ICE officials concealed the circumstances leading up to Jimenez's suicide. Plaintiffs allege that ICE officials denied knowing that Jimenez's erratic behavior was related to a mental illness, and Plaintiffs contend that ICE officials denied having any indication that Jimenez was at risk for suicide. Plaintiffs pointed to two reports reviewing the circumstances of Jimenez's death; neither is dated, but both reference a July 2017 autopsy report. It is unclear from the present record when Plaintiffs received these reports or some other indication that the conduct of ICE officials

or IHSC medical personnel contributed to Jimenez's injuries and death.

The Government argues that it is obvious that Plaintiffs immediately knew that they had potential claims against the Government based on acts and omissions of ICE and IHSC officials because their lawyer sent a preservation notice to the Government two days after Jimenez's death. The Government further asserts that the preservation letter suggests that Plaintiffs were aware *before* Jimenez died that he had potential claims against the Government based on his solitary confinement and psychiatric treatment. But nothing in the present record establishes when Plaintiffs obtained information about Jimenez's mental health treatment at Stewart Detention Center, the extent to which his mental health deteriorated, or the circumstances of Jimenez's placement in solitary confinement. Based on the present record, therefore, Plaintiffs were not put on notice of a causal connection between Jimenez's injuries and the alleged misconduct of Government employees until sometime after May 15, 2017. Accordingly, the Court cannot conclude as a matter of law at this stage in the litigation that the claims for pre-May 15, 2017 injuries are time-barred.[5]

---

[5] Plaintiffs also argue that their claims are timely under the continuing tort theory. The Court is skeptical that this principle has any application here, but the Court need not wade into those waters given that it has decided not to dismiss Plaintiffs' claims on other grounds.

17

## II. Are Plaintiffs' Claims Barred under the FTCA's Independent Contractor Exception?

Under the FTCA, government employees whose acts and omissions give rise to liability include officers and employees of any federal agency, but not "any contractor with the United States." 28 U.S.C. § 2671. The Government contends that Plaintiffs' claims must be based on conduct of contractors who were employed by Stewart County and CoreCivic, the entity that provides security services at Stewart Detention Center, not on the conduct of ICE personnel. Plaintiffs, however, explained in their Complaint and again in their brief that their claims are based on the conduct of specific ICE employees, including Sean Gallagher, John Bretz, James Blankenship, their subordinates, and IHSC personnel—not on the conduct of Stewart County or CoreCivic employees.

The Government appears to argue that even if Plaintiffs adequately alleged that ICE employees' acts and omissions contributed to their injuries, the Complaint still fails because, as a factual matter, independent contractors and not federal actors committed the acts and omissions that gave rise to the injuries in this case or that the injuries were caused by conduct that fell within the contractual responsibilities of Stewart County and CoreCivic. In support of this argument, the Government relies on facts outside the Complaint, which the Court cannot consider without converting the motion to dismiss into a summary judgment

motion. The Court finds that this issue would be better addressed on a motion for summary judgment following discovery. Accordingly, the motion to dismiss based on the independent contractor exception is denied.

## CONCLUSION

For the reasons set forth above, the Court denies the Government's motion to dismiss (ECF No. 20).

IT IS SO ORDERED, this 17th day of September, 2020.

> S/Clay D. Land
> _____
> CLAY D. LAND
> U.S. DISTRICT COURT JUDGE
> MIDDLE DISTRICT OF GEORGIA